## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**UNITED STATES OF AMERICA**                    **CRIMINAL ACTION**

**VERSUS**                                      **NO.  13-205**

**ROMALIS PARKER, ET AL.**                      **SECTION: "E" (2)**

## <u>ORDER AND REASONS</u>

This is criminal action charging twelve defendants with violations of the Racketeer Influenced Corruption Organization Act ("RICO"),[1] the Violent Crimes in Aid of Racketeering Act ("VICAR"),[2] the Federal Controlled Substances Act ("FCS"),[3] and the Federal Gun Control Act ("FGC").[4]  Three defendants—Romalis Parker ("Parker"), Nyson Jones ("Jones"), and Sidney Patterson ("Patterson")—have filed motions to suppress.[5]  The questions presented by each motion are whether the challenged evidence was seized in violation of the Fourth Amendment, and, if so, whether the exclusionary rule should apply.  Patterson's motion presents the additional question of whether his confession to police should be suppressed.  For the following reasons, the Motions are DENIED in their entirety.

## BACKGROUND

On September 19, 2013, a federal grand jury in the Eastern District of Louisiana returned a twenty-count indictment.[6]  Count 1 charges Patterson and two other

---

[1] 18 U.S.C. § 1961 *et seq.*
[2] 18 U.S.C. § 1959.
[3] 21 U.S.C. § 841 *et seq.*
[4] 18 U.S.C. § 921 *et seq.*
[5] R. Docs. 260, 278, 277, respectively.
[6] R. Doc. 1.

defendants (the "RICO Defendants") with membership in a criminal enterprise operating in the Eighth Ward of New Orleans known as "Ride or Die."  Count 1 further charges a broad RICO conspiracy to distribute controlled substances and to commit murder, robbery, battery, and assault in furtherance of the conspiracy.  These violent acts frequently involved the use of firearms.  Count 1 contains 52 overt acts, including the murder of four individuals.  Each of the non-RICO Defendants is mentioned at least once in the overt acts section of Count 1.

Count 2 charges all defendants with conspiracy to distribute and possess with the intent to distribute 280 grams or more of crack cocaine and non-specific quantities of heroin and marijuana.  Count 3 charges the defendants with conspiracy to possess and use firearms in furtherance of the crimes charged in Counts 1 and 2.  Counts 4 through 20 charge individual defendants with various violations of the FCS, the VICAR, and the FGC.

## LEGAL STANDARD

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures,"[7] but does not expressly prohibit the use of evidence obtained in violation of its commands.[8] This rule—the so-called "exclusionary rule"—was created by the courts.[9]  Its purpose is to deter future Fourth Amendment violations, rather than redress the injury occasioned

---

[7] U.S. Const. amend. IV.
[8] *Arizona v. Evans*, 514 U.S. 1, 10 (1995).
[9] *United States v. Calandra*, 414 U.S. 338, 347 (1974).

2

by an unconstitutional search or seizure.[10]   Accordingly, "where suppression fails to yield 'appreciable deterrence,' exclusion is 'clearly . . . unwarranted.'"[11]

As a general rule, the proponent of a motion to suppress must prove by a preponderance of the evidence that the evidence in question was obtained in violation of his or her Fourth Amendment rights.[12]   In the case of warrantless search or seizure, the burden shifts to the Government to prove by a preponderance of the evidence that its actions were constitutional.[13]

## DISCUSSION

Parker, Jones, and Patterson each filed a motion to suppress.  The Court held an evidentiary hearing.[14]  The Court's findings are below.

I.   Parker

Parker moves to suppress an AK47 assault rifle found in his bedroom closet during the execution of a search warrant at 2832 Law Street on March 23, 2010.  Aline Parker ("A. Parker"), Parker's mother, cleaned her son's bedroom on the morning of March 23, 2010.  She testified the closet door was closed at that time.  She did not observe the AK47 assault rifle at any point during her morning cleaning.

At some point after A. Parker finished cleaning, Parker's girlfriend, Ashley Smith ("Smith"), entered Parker's bedroom.   Smith remained in the bedroom for an

---

[10] *See United States v Leon*, 468 U.S. 897, 906 (1984).

[11] *Davis v. United States*, 131 S. Ct. 2419, 2426–27 (2011) (alteration in original) (quoting *United States v. Janis*, 428 U.S. 433, 454 (1976)).

[12] *United States v. Iraheta*, 764 F.3d 455, 460 (5th Cir. 2014).

[13] *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001).

[14] When confronted with a motion to suppress, the court should hold an evidentiary hearing "if the defendant alleges sufficient facts which, if proven, would justify relief."  *United States v. Harrelson*, 705 F.2d 733, 737 (5th Cir. 1983).  The Court is satisfied the moving defendants have made this showing.

indeterminate amount of time.  A. Parker did not reenter the bedroom after Smith exited and before NOPD executed the search warrant.[15]

At approximately 3:25 p.m., Detective Michael Sinegar and Officers Ananie Mitchell and Junious Grady executed a search warrant at 2832 Law Street.  The object of the search warrant was a flat-screen television NOPD believed Parker stole from another residence.  At this time, the officers also attempted to execute an arrest warrant for Parker in connection with the alleged burglary.

After showing the warrants to A. Parker, officers entered the residence.  Parker was not home.  Officer Mitchell and Officer Grady entered Parker's bedroom.  The closet door was open.[16]  The officers observed an AK47 assault rifle in plain sight.  Officer Grady yelled "gun!"  Detective Sinegar heard this call and entered the bedroom.  To his right, Detective Sinegar observed a flat screen television sitting atop the chest of drawers. To his left, Detective Sinegar observed an assault rifle inside the bedroom closet.[17]  Officer Grady ran the serial number of the firearm through NOPD's system.  The check did not reveal the firearm was stolen.  The barrel of the firearm had not been illegally modified.  In short, it was not immediately apparent that the firearm was illegal or that it had been used for illicit activity.

Officers subsequently informed A. Parker of the firearm.[18]  A. Parker told the officers it did not belong to her and did not belong in the house.  A. Parker requested the officers to remove the firearm from the house.  Officers left the house with the firearm and the flat-screen television.

---

[15] For this reason, A. Parker was unable to testify as to whether the closet door was open at the time officers entered the bedroom.
[16] Detective Sinegar testified that Officers Mitchell and Grady informed him the closet door was open when they entered.  The police report also reflects the closet door was open.
[17] The closet door was still open.
[18] A. Parker sat in the living room while officers searched her son's bedroom.

On April 19, 2013, NOPD ran a ballistics check on the firearm.   The check allegedly revealed the firearm was used to perpetrate a murder.   From the time NOPD seized the firearm until the time NOPD ran the ballistics check, neither Parker nor any other party challenged NOPD's possession of the firearm or requested its return.

Parker now moves to suppress the firearm as the product of an illegal search and seizure.   The parties spill much ink arguing whether the seizure was justified under the "plain view" exception to the warrant requirement.   The Court need not decide this issue today, for even if the search and seizure was "unreasonable" under the Fourth Amendment, suppression is not warranted.

The Supreme Court has "repeatedly rejected the argument that exclusion is a necessary consequence of a Fourth Amendment violation."[19]   This is because the exclusionary rule is not a "personal constitutional right" but is instead a prophylactic rule designed to deter future Fourth Amendment violations.[20]   To determine whether exclusion is appropriate, a court should weigh the "deterrence benefits of suppression" against the "heavy costs" of exclusion.[21]   As explained more fully below, the Court finds in this situation that any benefits of suppression are significantly outweighed by the costs of exclusion.

It is well established that deterrence benefits "var[y] with the culpability of law enforcement conduct."[22]   When officers act with "deliberate," "reckless," or "grossly negligent" disregard for Fourth Amendment rights, "the deterrent value of exclusion is

---

[19] *Herring v. United States*, 555 U.S. 135, 141 (2009); *see also Davis*, 131 S. Ct. at 2427 (noting the exclusionary rule is a not a "self-executing mandate implicit in the Fourth Amendment.").
[20] *Davis*, 131 S. Ct. at 2426.
[21] *See id.* at 2427.  Parker did not even attempt to engage in this balancing exercise.
[22] *Herring*, 555 U.S. at 143.

strong and tends to outweigh the resulting costs."[23]   If, on the other hand, officers exhibit simple negligence or act with an objectively good faith belief that their conduct is lawful, exclusion is generally inappropriate.[24]

The deterrence benefits of exclusion in this case are extremely low, if not entirely absent.  While lawfully inside a residence, officers observed an assault rifle through the open door of a closet in the bedroom of a 17-year old male.  The mother and owner of the home requested this dangerous weapon be removed immediately.   Under these circumstances, it was objectively reasonable for officers to believe A. Parker could lawfully consent to search and seizure of the firearm.[25]

In sum, the officers did not engage in "intentional conduct that was patently unconstitutional," or conduct that constitutes "recurring or systemic negligence."[26] Accordingly, assuming *arguendo* a Fourth Amendment violation occurred, suppression would have a *de minimis* deterrent value.   Because the "deterrence benefits of suppression" do not "outweigh its heavy costs," the "harsh sanction of exclusion" is inappropriate.[27]

II.   Jones

Jones moves to suppress a firearm seized during a traffic stop on July 30, 2012.[28] At approximately 10:45 p.m. that evening, Officers Sean Ogden and Christopher Carter

---

[23] *Davis*, 131 S. Ct. at 2427.

[24] *See id.* at 2427–28.

[25] The Court makes no finding as to whether A. Parker could consent to the search and seizure as a matter of law.  Rather, the Court finds it was objectively reasonable for officers to believe she could consent in light of her status as the owner of the home, Parker's status as a minor, and A. Parker's statement that the firearm did not belong in her home.

[26] *See Herring*, 555 U.S. at 702.

[27] *See id.* at 2427–28.

[28] Jones initially also moved to suppress the marijuana referenced in Overt Act 10 of the Indictment. Defense counsel conceded during the evidentiary hearing that his argument for suppression was premised on an erroneous view of the facts.  The testimony was clear that Jones voluntarily discarded the marijuana

observed a vehicle disregard a stop sign at the intersection of Music Street and North Roman Street. The officers activated the lights and sirens of their police cruiser. The driver eventually stopped the target vehicle, exited, and began to walk away. The officers called the driver back to the vehicle. While Officer Carter questioned the driver, Officer Ogden approached the stopped vehicle from the rear. He noticed passengers in the front and back seats. While approaching the vehicle, Officer Ogden observed the passenger in the front seat—later determined to be Jones—bend forward towards the floorboard of the vehicle. Officer Ogden became concerned for his safety and asked to see Jones's hands. Jones did not comply. Officer Ogden asked again to see Jones's hands. This time, Jones complied. As Officer Ogden continued to approach the passenger side of the vehicle, he noted the presence of three young children in the backseat. Officer Ogden then opened the passenger door, observing what he believed to be a handgun partially concealed in a shoe. Jones exited the vehicle with his hands raised. Officer Ogden immediately placed Jones in handcuffs and escorted him to the rear passenger side of the stopped vehicle. Officer Ogden returned to the passenger seat of the vehicle and removed a loaded handgun and a separate high-capacity magazine. Officer Ogden placed these items in the police cruiser.

At some point during this encounter, Jones stated that he found the firearm approximately fifteen minutes before the traffic stop and that he planned to store the firearm underneath his mattress.[29] Officer Ogden ran a computer check on Jones, which revealed he was a convicted felon. Jones was placed under arrest for unlawful possession of a firearm by a convicted felon. Officer Ogden estimated the entire

---

while the police were approximately one-and-a-half blocks away. Counsel conceded it was proper for officers to retrieve the marijuana and that no Fourth Amendment violation occurred.

[29] The record is unclear exactly when Officer Ogden began to question Jones.

investigation—including the time it took to complete paperwork on the scene—lasted approximately one hour.

Jones now moves to suppress the firearm as the fruit of an unconstitutional search and seizure.  The stop of a vehicle and detention of its occupants constitutes a "seizure" under the Fourth Amendment.[30]  The legality of a traffic stop is analyzed under the two-part test set forth in *Terry v. Ohio*.[31]  First, the Court inquires whether the traffic stop was justified at its inception.[32]  If so, the Court inquires "whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop."[33]

Regarding the first prong, a traffic stop is justified at its inception when an officer has reasonable suspicion that a traffic violation occurred or is about to occur.[34]  Officer Ogden observed the target vehicle disregard a stop sign—a clear traffic violation. Accordingly, the constitutionality of this traffic stop *vel non* turns on the second prong of the *Terry* test.

Once lawfully stopped, the detention must last no longer than necessary to effectuate the purpose of the stop.[35]  During this time, an officer may order the occupants out of the car,[36] ask the occupants for identification and run a computer check for outstanding warrants,[37] and engage in "wide-ranging" questioning unrelated

---

[30] *United States v. Raney*, 633 F.3d 385, 389 (5th Cir. 2011).
[31] 392 U.S. 1 (1968); *see also United States v. Jenson*, 462 F.3d 399, 403 (5th Cir. 2006) ("We analyze the validity of traffic stops under *Terry* . . . .").
[32] *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc).
[33] *Id.*
[34] *See United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005).  "An officer may stop a motorist for a traffic violation even if, subjectively, the officer's true motive is to investigate unrelated criminal offenses."  *United States v. Sanchez-Pena*, 336 F.3d 431, 437 (5th Cir. 2003).
[35] *Brigham*, 382 F.3d at 507.
[36] *Maryland v. Wilson*, 419 U.S. 408, 414–15 (1997).
[37] *United States v. Pack*, 612 F.3d 341, 350–51 (5th Cir. 2010).

8

to the purpose of the traffic stop.[38]  As a general rule, if all computer checks come back clean, any questioning must stop, and the driver and passengers must be released.[39]  If, however, additional reasonable suspicion arises before the initial purpose of the stop has been fulfilled, the detention may continue until the new reasonable suspicion has been dispelled or confirmed.[40]  In determining whether reasonable suspicion develops, a court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing."[41]

As a preliminary matter, the Court finds Jones was not detained longer than necessary to effectuate the initial purpose of the stop—to investigate the traffic violation. "There is . . . no constitutional stopwatch on traffic stops."[42]  Furthermore, there is no *per se* rule that an officer conducting a traffic stop must immediately initiate the relevant background checks before asking questions.[43]

More importantly, even if the seizure lasted longer than necessary to investigate the traffic violation, it was justified by the development of additional reasonable suspicion.  As he approached the stopped vehicle, Officer Ogden observed Jones bend towards the floorboard.   Officer Ogden asked to see Jones's hands.  Jones did not immediately comply.  After Jones exited the vehicle, Officer Ogden discovered a loaded firearm and a high-capacity magazine.  Jones explained (quite conveniently) that he discovered the firearm fifteen minutes before the traffic stop.  Recognizing Officer

---

[38] *See Lopez-Moreno*, 420 F.3d at 430–31.  "This is because detention, not questioning, is the evil at which *Terry's* second prong is aimed."  *United States v. Macias*, 658 F.3d 509, 517 (5th Cir. 2011) (internal quotation marks omitted).

[39] *United States v. Jenson*, 462 F.3d 399, 404 (5th Cir. 2006).

[40] *Lopez-Moreno*, 420 F.3d at 431.

[41] *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)).

[42] *Brigham*, 382 F.3d at 511.

[43] *United States v. Estrada*, 459 F.3d 627, 631 (5th Cir. 2006); *Brigham*, 382 F.3d at 511.

Ogden's right "to draw on [his] own experience and specialized training to make inferences from and deductions about the cumulative information available to [him] that 'might well elude an untrained person,'"[44] the Court finds Officer Ogden had reasonable suspicion to believe the firearm was connected with illegal activity or possessed illegally.   Accordingly, Officer Ogden was entitled to "diligently pursue a means of investigation that was likely to confirm or dispel [his] suspicions quickly."[45] He did just that.

Having determined the detention was constitutionally permissible, the Court must now determine whether the warrantless seizure of Jones's property—the firearm—was unreasonable.   The "plain view" doctrine will support a warrantless seizure if the following requirements are met: (1) the officer is lawfully in the position from which he or she views the evidence; (2) the incriminating nature of the evidence is immediately apparent; and (3) the officer has a lawful right of access to the evidence.[46]

Jones argues the second prong is not met because Officer Ogden was unaware of his felony conviction at the moment the firearm was removed from the vehicle.   It was not until *after* the firearm was seized and Officer Ogden ran a background check that he discovered Jones was a convicted felon.   Under these circumstances, Jones argues the firearm must be suppressed.

In *United States v. Roberts*, officers entered an apartment for the purpose of executing an arrest warrant.[47]   Once inside, officers discovered two firearms.[48]   There

---

[44] *Arvizu*, 534 U.S. at 272(quoting *Cortez*, 449 U.S. at 418).
[45] *Brigham*, 382 F.3d at 511 (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)).
[46] *United States v. De Jesus-Batres*, 410 F.3d 154, 159 (5th Cir. 2005).
[47] 612 F.3d 306, 313 (5th Cir. 2010).
[48] *Id.*

were five individuals in the apartment.[49]   The officers lined the individuals up against the wall and then removed the firearms from the apartment.[50] While investigating the individuals in the apartment, officers learned that one of the individuals was an unlawful user of a controlled substance and that another had a prior felony conviction.[51] Thus, it was illegal for those individuals to possess the firearms—a fact that was unknown to officers when they removed the firearms from the residence.[52]

Even though the incriminating nature of the firearms was not immediately apparent at the moment of removal, the Fifth Circuit upheld the temporary seizure as necessary to ensure officer safety.[53]   "The individuals [in the apartment] were not handcuffed or incapacitated and in the event of a scuffle could have accessed the unsecured weapons."[54]  Under these circumstances, the court held officers were entitled to maintain control over the firearms until they completed their investigation of the individuals in the apartment.[55]  Because officers discovered during that investigation the firearms were illegally possessed, "the illegality of the firearms became apparent such that permanent seizure was warranted."[56]

As in *Roberts*, the temporary seizure in this case was necessary to ensure the safety of the officers.  Although Jones was handcuffed at the rear of the vehicle, the record is unclear whether the driver of the vehicle was in handcuffs and therefore could have gained access to the firearm.  More importantly, there were three young children in the backseat.  While Officer Ogden and Officer Carter engaged the passenger and driver,

---

[49] *Id.*
[50] *See id.*
[51] *Id.* at 314.
[52] *See id.*
[53] *Id.* at 313–14.
[54] *Id.* at 313.
[55] *Id.* at 314.
[56] *Id.* at 313.

respectively, the children were left in the car.  Only the front passenger seat separated the children from a loaded firearm and a high-capacity magazine.  Under these circumstances, temporary seizure of the firearm was reasonable—if not necessary—to secure the safety of the officers and the vehicle's occupants.[57]  Once seized for this purpose, and upon discovery that Jones was a convicted felon, "the incriminating nature of the weapon became apparent and it was then subject to permanent seizure as contraband."[58]

III.   Patterson

Patterson moves to suppress several items of evidence: (1) marijuana abandoned during a police chase on March 1, 2008; (2) cocaine seized during a search incident to arrest on March 30, 2008; (3) a firearm discovered and an incriminatory statement made during a traffic stop on May 26, 2010; and (4) marijuana and crack cocaine seized during a warrantless search of a residence on September 15, 2011.

A. *The March 1, 2008 Incident*

At approximately 2:00 p.m. on March 1, 2008, Detective Dan Malo, Detective Athena Monteleone, and Sergeant Nicole Barbe received a complaint about two black males selling marijuana on the 1100 block of Canal Street.  The complaint described the clothing of the suspects.

Detectives Malo and Monteleone proceeded to the 1100 block of Canal Street in an unmarked Chevy Impala.  Upon arrival, they observed two individuals—one of whom was later identified as Patterson—matching the physical description in the complaint.

---

[57] *See id.* at 314 ("The officers acted reasonably—the touchstone requirement of the Fourth Amendment—in seizing the weapons for the safety of themselves and the apartment's occupants."); *cf. Arizona v. Johnson*, 555 U.S. 323, 330 ("[T]he [Supreme] Court has recognized that traffic stops are 'especially fraught with danger to police officers.'") (quoting *Michigan v. Long*, 463 U.S. 1032, 1047 (1983)).
[58] *United States v. Rodriguez*, 601 F.3d 402, 408 (5th Cir. 2010).

Detectives Malo and Monteleone exited their vehicle.   Detective Monteleone was dressed in plain clothes with police credentials around her neck.   Patterson and the other individual briefly conferred with each other, turned around, and starting walking in the opposite direction of the detectives.   The detectives identified themselves as police officers and ordered Patterson and the other individual to stop.   They did not, and a chase ensued.   Detective Monteleone pursued Patterson.   Patterson eventually ran up the steps to a restaurant on 1104 Canal Street.   Detective Montelone was in close pursuit.   As he was ascending the stairs, Patterson reached into his left cargo pocket and retrieved a clear plastic bag.   Patterson discarded the bag into an open trash can at the top of the stairs.   Patterson then entered a small room in the restaurant.   With nowhere to go, Patterson submitted to Detective Monteleone and was placed under arrest. Officers subsequently retrieved the plastic bag abandoned during the chase.   The bag contained numerous smaller bags of marijuana.

Patterson appears to argue the marijuana should be suppressed, because officers did not have probable cause to arrest him.[59]   The Government appears to argue detectives were in "hot pursuit" of Patterson following a permissible *Terry* stop.[60]   Both arguments miss the mark.

The pertinent analysis begins with *California v. Hodari D.*,[61] a Supreme Court case with substantially similar facts.   In that case, officers were patrolling a high-crime area in an unmarked police vehicle when they noticed several youths huddled around a

---

[59] The basis for suppression is difficult to discern from Patterson's motion.   *See* R. Doc. 317, p. 2–3. Moreover, as explained more fully below, whether officers had probable cause to arrest Patterson is not relevant to whether the seizure of marijuana was unconstitutional.

[60] The Government's memorandum is similarly difficult to follow.   *See* R. Doc. 284, p. 6.

[61] 499 U.S. 621 (1991).

car on the curb.[62]  Upon observing the unmarked vehicle, the youths attempted to run away.[63]  An officer exited the vehicle wearing a jacket embossed with "Police" on the front and back.[64]  The officer pursued one of the fleeing youths, Hodari, on foot.[65]  During the chase, Hodari discarded a quantity of crack cocaine.[66]  "A moment later," the officer tackled Hodari, handcuffed him, and radioed for assistance.[67]  Hodari moved to suppress the cocaine as fruit of an illegal seizure.[68]

Assuming *arguendo* officers did not have reasonable suspicion to conduct a *Terry* stop of Hodari,[69] the issue before the Court was "whether, at the time he dropped the drugs, Hodari had been 'seized' within the meaning of the Fourth Amendment."[70] The Court noted that a seizure requires *"either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority."[71]  At the time Hodari discarded the drugs, he was not subjected to physical force and had not submitted to the officer's show of authority.[72]  Therefore, Hodari was not "seized" for Fourth Amendment purposes, and the drugs could not have been the fruit of an unlawful seizure.[73]

This case, like *Hodari D.*, involved the voluntary abandonment of contraband prior to the application of physical force or submission to authority.  Because there was

---

[62] *Id.* at 622.
[63] *Id.* at 622–23.
[64] *Id.* at 622.
[65] *Id.* at 623.
[66] *Id.*
[67] *Id.*
[68] *Id.* at 623.
[69] *Id.* at 623 n.1.
[70] *Id.* at 623.
[71] *Id.* at 627 (emphases in original).
[72] *Id.* at 629.
[73] *Id.*

14

no seizure,[74] the Fourth Amendment is not implicated.[75]   There is no legal basis for suppressing the marijuana.[76]

      B. *The March 30, 2008 Incident*

      At approximately 11:10 p.m. on March 30, 2008, Officers Michael Pierce and Corey McCain observed a vehicle disregard a stop sign at the intersection of Claiborne Avenue and Frenchman Street.   The officers activated the lights and sirens of their police cruiser.   The target vehicle pulled over to the side of road.   There were two occupants.   The officers asked for identification.   Neither the driver nor the passenger had an identification card on his person but both offered their names.   The passenger identified himself as Sidney Patterson.   Officers subsequently ran a background check and discovered an outstanding traffic warrant for Patterson.   Patterson was placed under arrest.   Officer McCain conducted a search incident to arrest and seized three bags of crack cocaine wrapped inside of a one-dollar bill.

      Patterson moves to suppress the cocaine for two reasons.   First, NOPD has not provided sufficient evidence that the traffic warrant was active at the time of Patterson's

---

[74] *See United States v. Silva*, 957 F.2d 157, 159 (5th Cir. 1992) ("To effect a show of authority seizure, the suspect must yield to or comply with that show of authority."); *United States v. Jones*, 347 F. App'x 129, 135 (5th Cir. 2009) ("A police officer's show of authority does not effectuate a seizure unless the person yields or the officer applies physical force to restrain movement.").

[75] *See Jones*, 347 F. App'x at 135 ("[I]tems discarded by a fleeing suspect are abandoned and may be seized without reasonable suspicion or probable cause where the suspect has not yet been seized."); *United States v. Gonzalez*, 912 F. Supp. 256, 258 (S.D. Tex. 1995) ("If there were no seizure of Defendant by the agents, no Fourth Amendment concerns are implicated."); *cf. United States v. Valdiosera-Godinez*, 932 F.2d 1093, 1099 (5th Cir. 1991) ("Because the officers' conduct did not implicate the Fourth Amendment, it need not have been justified by reasonable suspicion.").

[76] Even if it could be argued that Patterson was "seized" for Fourth Amendment purposes when he discarded the marijuana, the seizure was justified by reasonable suspicion.   *See Silva*, 957 F.2d at 161 (finding no Fourth Amendment violation where officer pursued defendant with reasonable suspicion and defendant discarded contraband during pursuit).   Reasonable suspicion was established by the fact that Patterson fit the description of a person suspected of selling narcotics and the fact that Patterson ran from the officers unprovoked.   *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (finding reasonable suspicion where defendant fled from officers unprovoked in high-crime area).   Moreover, to the extent Patterson challenges the warrantless *search* of the trashcan, that argument clearly fails, because Patterson has no legitimate expectation of privacy in a public trashcan.   *See United States v. Iraheta*, 764 F.3d 455, 461 (5th Cir. 2014) ("In order to claim the Fourth Amendment's protection, a defendant must have a legitimate expectation of privacy in the invaded place.") (internal quotation marks omitted).

arrest.  Second, the questioning of Patterson—the passenger of the vehicle—was improper, because officers did not have reasonable suspicion he was engaged in criminal activity.  Neither of these arguments need detain the Court very long.

Regarding the first, NOPD has introduced sufficient evidence of an extant traffic warrant on the date of arrest.  Regarding the second, it is well established that officers may ask questions of and run background checks on the passengers of a vehicle while conducting a valid traffic stop.[77]  It is equally well established that officers may search a person incident to arrest without running afoul of the Fourth Amendment.[78]

C. *The May 26, 2010 Incident*

At approximately 2:50 p.m. on May 26, 2010, Officers Jehan Senananyake and Daniel Bagneris were patrolling a high-crime area in a marked police vehicle when they observed a civilian vehicle disregard a stop sign at the intersection of North Rocheblave and Eads Street.  The police vehicle activated its lights and siren.   The target vehicle stopped.  The windows were completely rolled down.  Officer Bagneris approached the driver side of the stopped vehicle while Officer Senananyake approached the passenger side.   During this approach, Officer Senananyake observed the passenger—later determined to be Patterson—continually look at the approaching officer through the side mirror.  Officer Senananyake further observed Patterson remove a metallic object from his waistband and place it between the passenger seat and the center console. When Officer Senananyake arrived at the passenger door, he observed the butt of a firearm inside the vehicle.   Officer Senananyake informed Officer Bagneris of his

---

[77] *See Pack*, 612 F.3d at 351.

[78] *Virginia v. Moore*, 553 U.S. 164, 176 (2008) ("We have recognized . . . that officers may perform searches incident to constitutionally permissible arrests in order to ensure their safety and safeguard evidence.").

observation.   The officers ordered all occupants out of the vehicle,[79] placed them in handcuffs, and advised them of their *Miranda* rights.[80]   Officer Bagneris subsequently retrieved a semi-automatic handgun from the stopped vehicle.   A record check revealed the firearm was stolen.   Officers then ran a background check on the occupants of the stopped vehicle and discovered an outstanding traffic warrant for Patterson.   Officer Senanayake testified Patterson was placed under arrest and escorted to the police car.   Officers entered the police car with Patterson. Patterson was not advised of his *Miranda* rights for a second time.   While the officers were completing paperwork for this incident, Patterson stated unprovoked that he had been shot once before and that he purchased the firearm off the streets for protection.   Patterson offered this statement freely and voluntarily.   It was not given in response to any question by the officers or during the course of any conversation with the officers.

Patterson moves to suppress both the firearm and the statement given to officers regarding the firearm.   The Court addresses each argument separately.   As explained more fully below, neither has merit.

      i.   *The Firearm*

Patterson appears to argue the firearm is the fruit of an illegal *Terry* stop.[81]   The Government has proved by a preponderance of the evidence officers had reasonable suspicion that a traffic violation occurred.[82]   Because the traffic stop was justified at its inception, the Court must determine whether it "last[ed] no longer than is necessary to

---

[79] There were three individuals in the vehicle, including Patterson.

[80] The Court makes no finding as to whether the occupants were under arrest at this time.

[81] Once again, Patterson's argument for suppression is inchoate and difficult to follow.   *See* R. Doc. 317, p. 5–7.

[82] In his opposition memorandum, "Defendant insists that the officers did not observe the driver of the vehicle run a stop sign," *id.* at p. 6, yet offers no evidence in support.

effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerge[d] ."[83]

As discussed earlier, while conducting a traffic stop, officers may order the passengers out of the car and run background checks. That officers first checked the firearm before running background checks on the passengers did not impermissibly extend the duration of the stop.[84] But even if it did, this brief extension was justified by reasonable suspicion. The traffic stop occurred in a high-crime area, which is a "relevant contextual consideration[] in a *Terry* analysis."[85] Moreover, Officer Senanayake testified he observed Patterson nervously remove a metallic item from his waistband. Officer Senanayake further believed the target vehicle had initially been avoiding another police vehicle. These circumstances provided a "particularized and objective basis for suspecting legal wrongdoing."[86]

Having determined the detention was constitutionally permissible, the Court must now determine whether the warrantless seizure of Patterson's firearm was reasonable. For substantially the reasons set forth in Section II of this Order, the temporary seizure of the firearm while officers completed their investigation was reasonable under the Fourth Amendment.[87] During the investigation, officers discovered the firearm was stolen. At this point, the firearm was subject to permanent seizure as contraband.[88]

---

[83] *Brigham*, 382 F.3d at 507.

[84] *Cf. id.* at 511 (holding that there is no "*per se* rule requiring an officer immediately to obtain the driver's license and registration information and initiate the relevant background checks before asking questions.").

[85] *Wardlow*, 528 U.S. at 124.

[86] *Arvizu*, 534 U.S. at 273 (internal quotation marks omitted).

[87] Although the occupants of the vehicle were handcuffed, the temporary seizure of the firearm was reasonable for officer safety in light of the special dangers inherent in traffic stops, *Johnson*, 555 U.S. at 330, and the fact that the traffic stop occurred in a high-crime area.

[88] *See Roberts*, 612 F.3d at 314; *Rodriguez*, 601 F.3d at 408.

ii. *The Confession*

Patterson argues he should have been re-advised of his *Miranda* rights after he was arrested.   Because he was not, Patterson argues his statement to Officers Senanayake and Bagneris should be suppressed.   The Court disagrees.

In the seminal case *Miranda v. Arizona*,[89] the Supreme Court adopted a set of warnings a suspect must be given "to safeguard the constitutional guarantee against self-incrimination."[90]   Prior to custodial interrogation, the suspect must be warned that (1) he has the right to remain silent, (2) anything he says can be used against him in a court of law, (3) he has the right to the presence of an attorney during questioning, and (4) if he cannot afford an attorney, one will be appointed for him prior to questioning if he so desires.[91]   If, despite these warnings, the suspect makes a statement to police, the statement is inadmissible in the Government's case-in-chief unless the Government can show the suspect "voluntarily, knowingly, and intelligently waived his rights."[92]

It is well established that the procedural safeguards of *Miranda* only apply when a suspect is "in custody" and "subjected to interrogation."[93]   Because Patterson was clearly in custody when the statement was made, the question presented is whether he was subjected to interrogation.   For purposes of *Miranda*, interrogation occurs "whenever a person in custody is subjected to either express questioning or its functional equivalent."[94]   The functional equivalent of express questioning is defined as "any words or actions on the part of the police (other than those normally attendant to

---

[89] 384 U.S. 436 (1966).
[90] *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2401 (2011).
[91] *Florida v. Powell*, 559 U.S. 50, 59–60 (2010).
[92] *See J.D.B.*, 131 S. Ct. at 2401 (internal quotation marks omitted).
[93] *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980); *United States v. Webb*, 755 F.2d 382, 391 (5th Cir. 1985) ("*Miranda* . . . applies only to statements made in the course of *custodial interrogation*) (emphasis added).
[94] *Innis*, 446 U.S. at 300–01.

arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."[95]

The record is clear that at the time the statement was made, Patterson was not under interrogation.   Rather, Patterson volunteered the statement unprovoked by anything the officers said or did.   As the Court expressly clarified in *Miranda*, "[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today."[96]   In other words, without interrogation, there can be no *Miranda* violation.[97]

D.  *The September 15, 2011 Incident*

At approximately 4:50 p.m. on September 15, 2011, Officers Benja Johnson, Pierce, and Senanayake observed several individuals shooting dice on the front porch of a residence at 1632 Mandeville Street.   Neither the owner nor lessee of the residence was present.   Officers exited an unmarked vehicle to arrest the individuals for illegal gambling.[98]   Upon viewing the officers, several individuals retreated inside the residence.[99]   Officers Johnson and Pierce pursued them and entered the residence without a warrant.   Once inside, the officers seized crack cocaine and marijuana in plain view in the living room.

Patterson moves to suppress the evidence as fruit of an illegal search.   He argues the "hot pursuit" exception to the warrant requirement does not apply.   The

---

[95] *Id.* at 301 (footnote omitted).

[96] 384 U.S. at 478.

[97] *See Edwards v. Arizona*, 451 U.S. 477, 485–86 (1981).

[98] The record is unclear whether the individuals were actually gambling.  The Court need not decide this issue today.

[99] The record is unclear whether Patterson was on the porch or inside the residence when officers arrived. Officer Johnson testified on direct examination that officers first encountered Patterson inside the residence but on cross-examination testified that Patterson was initially on the porch.

Government disagrees.   As explained more fully below, the parties have put the proverbial cart before the horse.

Patterson may not invoke the exclusionary rule unless his Fourth Amendment rights have been violated.[100]   "[T]he extent to which the Fourth Amendment protects people may depend upon where those people are."[101]   In other words, Fourth Amendment rights are "individually held" and may not be asserted "solely by reference to a particular place."[102]   To establish a Fourth Amendment violation, the defendant must prove by a preponderance of the evidence that he or she had a legitimate expectation of privacy in the area searched.[103]   To determine if this burden is met when police search real property,[104] courts examine the following factors:

> whether the defendant has a [property or] possessory interest in the thing seized or the place searched, whether he has a right to exclude others from that place, whether he has exhibited a subjective expectation of privacy that it would remain free from governmental intrusion, whether he took normal precautions to maintain privacy and whether he was legitimately on the premises.[105]

While no one of these factors is dispositive, "together they represent the concerns that should be addressed."[106]

Patterson did not own or lease 1632 Mandeville Street.[107]   More importantly, Patterson did not present evidence that he held a property or possessory interest in the residence.  Nor did he present evidence that he had the right to exclude others from the

---

[100] *Rakas v. Illinois*, 439 U.S. 128, 134 (1978).
[101] *Minnesota v. Carter*, 525 U.S. 83, 88 (1998).
[102] *United States v. Phillips*, 382 F.3d 389, 495 (5th Cir. 2004) (quoting *United States v. Vega*, 221 F.3d 789, 797 (5th Cir. 2000)).
[103] *United States v. Ibarra*, 948 F.2d 903, 905 (5th Cir. 1991); *Vega*, 221 F.3d at 796.
[104] *Kee v. City of Rowlett, Tex.*, 247 F.3d 206, 213 (5th Cir. 2001).
[105] *United States v. Cardoza-Hinojosa*, 140 F.3d 610, 615 (5th Cir. 1998) (alteration in original) (quoting *Ibarra*, 948 F.3d at 906); *Vega*, 221 F.3d at 795.
[106] *Cardoza-Hinojosa*, 140 F.3d at 615.
[107] This fact is not dispositive, because the Supreme Court has "held that in some circumstances a person may have a legitimate expectation of privacy in the house of someone else."  *Carter*, 525 U.S. at 89.

residence, that he had a subjective expectation of privacy, that he took normal precautions to maintain this privacy, or even that he was legitimately on the premises, since neither the owner nor any lessee was present during the search.  In fact, Patterson explicitly disclaimed any connection with 1632 Mandeville Street in his motion to suppress.[108]  As the Supreme Court recognized over thirty-five years ago: "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of *a third person's premises or property* has not had any of his Fourth Amendment rights infringed."[109]   Because Patterson has no Fourth Amendment rights to assert, his suppression argument is rotten at its core.

## CONCLUSION

For the reasons previously stated;

**IT IS ORDERED** that the Motions are **DENIED** in their entirety.

**New Orleans, Louisiana, this 12th day of May, 2015.**

_____
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[108] *See* R. Doc. 317, p. 10 ("[T]here is nothing linking Sidney Patterson to that house or the contents of that house.").
[109] *Rakas*, 439 U.S. at 134 (emphasis added).